# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**DAVID DRAWBAUGH, Ph.D.,**

    **Plaintiff**

**vs.**                                                  **No.**
                                                                    **JURY TRIAL DEMANDED**

**PSYCHIATRIC SOLUTIONS, INC. (PSI)
and PEAK BEHAVIORAL HEALTH
SERVICES, LLC**

    **Defendants.**

## COMPLAINT

Plaintiff, David Drawbaugh, through his undersigned counsel, for his Complaint against Defendants, Psychiatric Solutions, Inc. (hereinafter, PSI) and Peak Behavioral Health Services (hereinafter Peak), states as follows:

## PARTIES, JURISDICTION AND VENUE

1.    Plaintiff, David Drawbaugh, Ph.D., is a resident of New Mexico, Virginia, and Indiana. Formerly he was the Chief Executive Officer for Peak Behavioral Health Services at two New Mexico locations.

2.    Defendant Psychiatric Solutions, Inc. is a publicly traded company which owns and operates psychiatric hospitals and behavioral health facilities throughout the United States including New Mexico. PSI is the parent company of Defendant Peak Behavioral Health Services.

3.    Defendant Peak Behavioral Health Services (hereinafter Peak) is a foreign limited liability company and a wholly owned subsidiary of PSI. At all times relevant to this Complaint, Peak provided inpatient services and residential treatment center services in Santa Teresa, New Mexico, and residential and day habilitation services for those with developmental disabilities

in Clovis, New Mexico.

4. The actions and events relevant to this matter occurred in New Mexico.

5. Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 (federal question) and 1367(supplementary jurisdiction).

## FACTS COMMON TO ALL COUNTS

6. PSI acquired Alliance Behavioral Health Services which included the Peak Hospital and the DD Programs in Las Cruces and Clovis from Frank Braden in 2004.

7. On January 6, 2007 Dr. David Drawbaugh was hired by PSI for the position of CEO for Peak Behavioral Health Services in Santa Teresa, New Mexico.

8. During the negotiations for that job in late 2006 Drawbaugh was given a choice of being the CEO of Peak or of another PSI facility called Mesilla Valley.

9. Drawbaugh was given financial statements of the two entities to study and was told by several PSI and Peak representatives that Peak had the stronger financial performance and had greater potential for Drawbaugh.

10. Drawbaugh was informed that there were some financial challenges at Peak and that part of Peak's facilities was currently under an admission hold but that the issues surrounding that admission hold should be resolved soon probably prior to Drawbaugh starting at Peak. That information turned out to be incorrect.

11. Drawbaugh accepted the position at Peak and began work as the CEO for Peak in January 2007.

12. Drawbaugh was promised a salary of $145,000 plus benefits plus a 50% bonus based on the earnings before interest, taxes, depreciation and amortization (EBIDTA) of Peak. In other words, Drawbaugh's bonus was tied to Peak's operations hitting specific financial

targets.

13.     Drawbaugh was not told prior to accepting the CEO position that Peak's financial statements did not reflect the appropriate accounting related to two debt issues.

14.     Before Plaintiff began working for Peak, he was not informed by Peak that the State of New Mexico claimed that it had made an overpayment of approximately $400,000 to Peak while it was owned by Frank Brayden for which the State was seeking reimbursement from Peak.

15.     Before Plaintiff began working at Peak, he was not informed by PSI that Peak had aged accounts receivables which were not reflected as bad debt on Peak's financial statements he had been given.

16.     After beginning his job at Peak, Drawbaugh was advised on January 26, 2007 by Doug Smith, who was the CFO for another PSI facility (Mesilla Valley Hospital), that Peak's finances were "a mess" and that a large amount of bad debt was not written off by the company. Mr. Smith was aware of the financial condition of Peak because he had been helping out with the financial operations at Peak during a transition period.

17.      Mr. Smith advised Drawbaugh that he needed to set aside a reserve to cover those debts and further advised Drawbaugh to contact Claudia Naranjo, who was a contract employee that provided accounting services for Peak and who had personal knowledge of the bad debt issues.

18.      Drawbaugh learned at a meeting held on February 6, 2007 with Doug Smith, Claudia Naranjo, Ruben Paredes (Peak's CFO) and Ray Estrada (Peak's Business Office Director) that there were two items that were not properly posted in financial statements: (1) up to $400,000 in overpayments to the Clovis DD program which the State of New Mexico was

seeking to recoup from Peak and (2) accounts receivables which had aged and which should have been reflected as bad debts as required under generally acceptable accounting principles.

19. The previous financial treatment of the two issues was also contrary to the internal PSI standards of accounting which requires all accounts receivables to be recorded at net realizable value at each month's end.

20. On that same day Drawbaugh reported the bad debt issues to Max Lauderdale, PSI Division President, who said he would speak to Mike McCullough, who was PSI's Interim Division CFO, about the issue.

21. On February 9, 2007 Mike McCullough told David Drawbaugh he would look into any adjustments for bad debt in previous years and get back to him.

22. On February 10, 2007 Mike McCullough emailed David Drawbaugh and advised him that an adjustment was made in December 2006 and that there was a great likelihood of having the claims paid. He further indicated that based on the information sent to him in January there was no expense needed for bad debt for January 2007.

23. On February 13, 2007 Claudia Naranjo and Esperanza Herrera (Peak Controller) told Drawbaugh that Mike McCullough was not telling the truth and that he was well aware that a prior adjustment for the bad debt had been reversed.

24. On February 28, 2007 Claudia Naranjo indicated to Drawbaugh that her staff was working on resubmission and billing of unpaid claims (accounts receivables) and that there was over $250,000 in bad debt and that at most only $128,000 could possibly be recovered. The work being done by Naranjo was being overseen by Ray Estrada (Peak Business Office Director).

25. Drawbaugh provided that information to Max Lauderdale and asked what he

should do. Lauderdale indicated he would be discussing it with the new Division CFO, Rick Mahalingham, and told Plaintiff to hold off taking any action.

26. On March 19, 2007 Plaintiff was on a conference call with management employees of PSI and Peak.

27. During the call, Drawbaugh raised questions regarding the "upstream filing" for the first quarter of 2007 and the lack of reference to the bad debt. He was advised by Lauderdale that not all of the data was available yet and there was no need to raise any alarms. The term "upstream filing" refers to the fact that Peak's financial statements were sent to PSI for inclusion in PSI's financial statements.

28. On March 22, 2007 Drawbaugh received additional preliminary data from Claudia Naranjo regarding the substantial amount of bad debt related to the claims never paid and the unlikelihood of collection.

29. Drawbaugh discussed the data with Max Lauderdale and Mahalingham who advised him to set aside a reserve of about $40,000 per month for bad debt in the correct category.

30. The setting aside of a reserve of about $40,000 per month created an adverse impact on Peak's monthly Earnings Before Interest, Taxes, Depreciation and Amortization (EBITDA).

31. On April 13, 2007 Plaintiff was informed that PSI would send internal auditors to Peak the following week.

32. PSI auditors conducted an audit and provided a report to PSI corporate management. Several areas were mentioned as being in need of immediate attention and urgent implementation of standard internal control policies and procedures.

33. Drawbaugh's probationary period successfully ended in early May, 2007.

34. In early May 2007, PSI corporate officials criticized the financial condition of Peak and Mesilla Valley. Corporate officials told Drawbaugh to get Peak finances in order quickly. They also told Plaintiff to lay off 45 fulltime employees and to initiate other cost savings measures.

35. On May 22, 2007 Claudia Naranjo told Plaintiff that she had previously tried to alert former PSI corporate officials about the nondisclosure of bad debt and other problems regarding Peak but was only retaliated against. At that time Claudia Naranjo advised Drawbaugh about several problems she had identified.

36. On May 24, 2007 Drawbaugh advised Lauderdale of the information he had obtained from Claudia Naranjo. Lauderdale directed Drawbaugh to request Naranjo to prepare a written report.

37. On June 15, 2007 Drawbaugh received the written report from Naranjo and telephoned Lauderdale about its contents. The report included information regarding the bad debt, recoupment of overcharges by the State of New Mexico, disloyal employees and issues related to former management of Peak. Lauderdale told Drawbaugh to bring the report to the June 21-22 meeting and inquired if anyone had been provided the information or had a copy of the report.

38. On June 22, 2007 Drawbaugh met with Lauderdale and Cindy Dill, PSI Vice President of Human Resources and Colby Reagan of PSI's Legal Counsel Office.

39. They questioned him on whether he had shared the bad debt information with anyone. They also asked if he had an ulterior motive in bringing the bad debt information forward.

40. At that meeting Drawbaugh expressed his concerns regarding the bad debt and the possibility that prior financial statements would have to be amended.

41. They directed Drawbaugh to have Naranjo put the rest of her information into writing and to confidentially forward it to them and only them.

42. On June 27, 2007 Drawbaugh had dinner with Lauderdale who asked if Plaintiff was happy at Peak. Lauderdale also indicated that he had doubts about Drawbaugh and that he (Drawbaugh) seemed consumed by the bad debt issue. Lauderdale advised Drawbaugh to "forget about it" or "it will come back to bite you." Lauderdale also advised Drawbaugh that at that moment PSI corporate employees were at Peak asking around about him. Drawbaugh advised him that he had shared the information regarding the bad debt in compliance with company guidelines.

43. Between July 10 and July 13, 2007 the State completed its annual inspection of Peak for licensing and certification. The surveyors noted dramatic improvement in many operational categories.

44. On July 16, 2007 Drawbaugh and Ruben Paredes (CFO for Peak) completed an upstream financial filings to PSI on which they indicated that they were aware of untrue statements of material fact, or the omission of a material fact, that would make Peak's financial statements misleading.

45. When Drawbaugh advised Lauderdale that same day of the filing by Paredes, Lauderdale told him that he (Drawbaugh) could edit it. Drawbaugh informed him that he could not. Lauderdale responded by saying, "What makes you think I won't change it?"

46. During the week after the upstream filing completed by Drawbaugh and Paredas, Mahalingham and Lauderdale were asked for explanations and communications were had by PSI

corporate managerial employees about how best to respond.

47. On July 19, 2007 Lauderdale called Drawbaugh seeking an action plan for Peak with a focus on five priorities even though Drawbaugh had already told Lauderdale in June that his priorities were: labor, volume, contracts, expense reductions, bad debt, self-pay and charity.

48. Drawbaugh emailed the previously drafted action plan that was already being implemented.

49. Lauderdale stated he wanted weekly updates and that he would be at Peak more often in the future.

50. On July 27, 2007 Drawbaugh received a phone call from Lauderdale while Drawbaugh was returning to Santa Teresa from an interim legislative committee meeting during which Lauderdale asked for the additional information from Naranjo. Drawbaugh responded that he had been focusing on the future as requested but if Lauderdale wanted the information Drawbaugh would obtain it for him.

51. On August 1, 2007 Claudia Naranjo provided Plaintiff the additional written information requested by Lauderdale. Plaintiff forwarded the information to Lauderdale, Dill Regan.

52. During August, 2007 Drawbaugh provided PSI management with updates on progress on the action plan. Progress was noted in most areas.

53. In August 2007 numerous denials of claims submitted for 2005 and 2006 still existed. Those denials totaled several hundreds of thousands of dollars in aged bad debt.

54. PSI management personnel were aware of those bad debts which had not been written off or for which collection efforts were not being made.

55. During August 2007 Lauderdale repeatedly stated he would be coming to Santa

Teresa but did not do so until August 28, 2007.

56.  On August 28, 2007, in Santa Teresa, Lauderdale advised Drawbaugh that he had lost confidence in him, that PSI was an at will employer and that he wanted to make a change in the leadership of Peak. He stated that he had tried to warn Drawbaugh but that he felt Drawbaugh had become distracted with the bad debt issues. Later in the conversation Lauderdale indicated Drawbaugh's termination was due to the hospital's poor financial performance.

57.  Lauderdale then offered a severance agreement to Drawbaugh which would allow him to resign and receive a month's salary in severance pay. Lauderdale indicated that the termination and severance had been decided at the PSI corporate level.

58.  Drawbaugh advised Lauderdale that under the Bylaws only the governing board of the facility could take action to remove the CEO.

59.  Drawbaugh later contacted the PSI's Values Line and filed a complaint. Under the Values Line process, Drawbaugh was supposed to receive a followup from the investigation. Drawbaugh never received any further contact from the PSI Values Line.

60.  Subsequently Drawbaugh contacted Kathy Bolmer, EVP PSI, who said she would do an investigation and share the results with Drawbaugh. Drawbaugh is not aware of any investigation being done. He did not receive any results of any investigation.

61.  Drawbaugh also contacted Terry Bridges (PSI Chief Operating Officer). Bridges cited financial performance of the hospital as the reason for termination. He was ultimately offered three months separation pay but refused to consider a re-assignment.

62.  Drawbaugh did not agree to the proposed severance agreement.

## COUNT I: WRONGFUL DISCHARGE

63. Plaintiff incorporates the allegations in all preceding paragraphs as if fully set forth herein.

64. Plaintiff raised concerns about the accounting practices and reporting of Peak and PSI as well as other possible violations of the law by current and previous employees of Defendants.

65. Plaintiff's discharge from employment by Defendants was in violation of public policy.

66. Plaintiff's actions were taken in furtherance of a public interest rather than primarily to further a private interest.

67. Plaintiff's conduct which is protected by public policy was a motivating factor in the decision to discharge him.

68. Defendants' actions in discharging Plaintiff caused damages to Plaintiff.

69. Plaintiff is entitled to compensatory damages including but not limited to lost wages and bonuses, lost benefits, relocation expenses, expenses of securing new employment and pre-and post judgment interest.

70. Defendants' actions were malicious, willful, reckless, wanton and/or fraudulent.

71. Plaintiff is entitled to punitive damages from Defendants.

## COUNT II: VIOLATION OF SARBANES-OXLEY ACT

72. Plaintiff incorporates the allegations in all preceding paragraphs as if fully set forth herein.

73. Defendants are covered employers under 18 U.S.C. §1514A.

74. Plaintiff is a covered employee under 18 U.S.C. § 1514A.

75. Plaintiff engaged in conduct protected by the Sarbanes Oxley Act when he made disclosures and complaints to management of the Defendants about activities and conduct of the Defendants' employees which he reasonably perceived to be violations of securities statutes and regulations or could lead to shareholder fraud..

76. Some of the Plaintiff's disclosures and complaints related to the misrepresentation of the financial status of Peak and thereby of PSI due to the two accounting issues related to recoupment attempts of the State of New Mexico and the aged bad debts still carried on Peak's financial statements.

77. Plaintiff's disclosures and complaints centered on noncompliance with generally accepted accounting principles and the lack of adequate internal accounting controls.

78. Plaintiff's conduct is protected under Sarbanes Oxley and was a contributing factor of Defendants' decision to terminate Plaintiff.

79. Plaintiff timely filed a complaint with the Department of Labor on November 19, 2007 under Sarbanes Oxley, 18 U.S.C. 1514(A)(b)(2)(D).

80. The Department of Labor did not issue a final decision within 180 days and Plaintiff has notified the Administrative Law Judge of his intent to withdraw the administrative complaint and file an action in federal district court pursuant to 18 U.S.C. §1514A(b).

81. Defendants' actions in discharging Plaintiff caused damages to Plaintiff.

82. Plaintiff is entitled to compensatory damages including but not limited to lost wages and bonuses, lost benefits, relocation expenses and expenses of securing new employment. Plaintiff is also entitled to attorneys' fees, pre and post judgment interest and litigation costs.

## COUNT III: MISREPRESENTATION

83. Plaintiff incorporates the allegations in all preceding paragraphs as if fully set forth herein.

84. Defendants made negligent misrepresentations regarding the financial status of Peak during the negotiations prior to Plaintiff accepting a job at Peak.

85. The misrepresentations were untrue statements which the Defendants intended Plaintiff to rely on.

86. Plaintiff relied upon the Defendants' misrepresentations.

87. The Defendants had no reasonable ground for believing the misrepresentations were true.

88. Plaintiff suffered damages as a result of his reliance on those misrepresentations.

Plaintiff is entitled to compensatory damages including but not limited to lost wages and bonuses, lost benefits, relocation expenses and expenses of securing new employment.

89. Defendants' actions were malicious, willful, reckless, wanton and or fraudulent and Plaintiff is entitled to punitive damages from Defendants.

## COUNT IV: BREACH OF CONTRACT

90. Plaintiff incorporates the allegations in all preceding paragraphs as if fully set forth herein.

91. Plaintiff's employment with Defendants was subject to the Bylaws of the facilities and to the policies and procedures of the Defendants.

92. Defendants' termination of Plaintiff was done in a manner which was contrary to the Bylaws of Peak.

93. Defendants' termination of Plaintiff was done in a manner which violated the policies and procedures of PSI in that Defendants did not engage in progressive discipline regarding any alleged performance deficiencies of Plaintiff as required by its policies and procedures.

94. Plaintiff is entitled to compensatory damages including but not limited to lost wages and bonuses, lost benefits, relocation expenses and expenses of securing new employment.

95. Defendants' actions were malicious, willful, reckless, wanton and or fraudulent and Plaintiff is entitled to punitive damages from Defendants.

WHEREFORE, Plaintiff respectfully requests that this Court award to him compensatory damages including but not limited to lost wages and bonuses, lost benefits, relocation expenses and expenses of securing new employment, punitive damages, attorneys' fees, pre and post judgment interest, costs and any other relief deemed proper by this Court.

Respectfully Submitted,

/s/ Maureen A. Sanders
Maureen A. Sanders
Duff Westbrook
Sanders & Westbrook, P.C.
102 Granite Ave., NW
Albuquerque, NM 87102
(505) 243-2243